**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

UNITED STATES OF AMERICA                                    CRIMINAL ACTION

VERSUS                                                                          No. 21-98

SHIVA AKULA                                                              SECTION I

<u>**ORDER & REASONS**</u>

Before the Court are defendant Shiva Akula's ("Akula") motions[1] for judgment

of acquittal and for a new trial. The government opposes[2] the motions. Akula filed a

reply.[3] For the reasons that follow, the Court denies the motions and denies Akula's

request for oral argument.

## I.      BACKGROUND

On August 5, 2021, a grand jury returned an indictment charging Akula with

twenty-three counts of health care fraud in violation of 18 U.S.C. § 1347.[4] Counts 1

through 8 of the indictment charged Akula with fraudulently billing Medicare at the

General Inpatient ("GIP") level for three patients who did not qualify for GIP billing.[5]

Counts  9  through  11  charged  Akula  with  fraudulent  billing  under  Common

---

[1] R. Doc. Nos. 352, 353.

[2] R. Doc. No. 358 (original opposition); R. Doc. No. 388 (amended opposition).

[3] R. Doc. No. 363. Akula also filed a notice of supplemental authority asking the Court
to consider a recent decision by the U.S. District Court for the District of Maryland.
R. Doc. No. 389; *United States v. Elfenbein*, No. 22-146, 2023 WL 8829261 (D. Md.
Dec. 21, 2023). Although Akula does not explain how he believes this nonbinding
decision should affect the Court's reasoning, the Court has considered it and finds it
to be distinguishable.

[4] *See generally* R. Doc. No. 1.

[5] *See id.* at 9.

Procedural Terminology ("CPT") code 99236 for History and Physical forms ("H+Ps") that Akula's niece—an extern at Akula's company, Canon Hospice ("Canon")—copied from H+Ps prepared by referring physicians.[6] Counts 12 through 17 charged Akula with fraudulent billing under CPT code 99233, which Canon used to bill for physician services on top of the hospice per diem rate even though the per diem rate is intended to cover all physician services within the scope of hospice care.[7] Counts 18 through 23 charged Akula with fraudulent billing under CPT code 99350, which Canon used to bill for physician services during home visits in outpatient settings on top of the hospice per diem rate.[8] On November 6, 2023, following a five-day trial, a jury returned a verdict of guilty on all counts.[9] Akula's sentencing is scheduled for February 21, 2024.[10]

Following his convictions, Akula moved for judgment of acquittal and for a new trial. Akula's motion for judgment of acquittal asserts that the evidence presented at trial was insufficient to satisfy each element of health care fraud for the twenty-three counts of which he was convicted.[11] Specifically, Akula contends that the government failed to present sufficient evidence that he acted with the requisite intent to commit health care fraud.[12] Akula's motion for a new trial argues that the "weight and preponderance of the evidence weighs heavily against the verdict[,]" that Akula

---

[6] *See id.* at 10.

[7] *See id.*

[8] *See id.*

[9] R. Doc. No. 339.

[10] R. Doc. No. 338.

[11] R. Doc. No. 352-1, at 2.

[12] *Id.* at 4.

"received ineffective assistance of counsel" when his trial attorney agreed to admit a government expert's report, and that this Court erred in limiting the testimony of a defense expert.[13]

## II.    STANDARDS OF LAW

### a. Motion for Judgment of Acquittal

Pursuant to Federal Rule of Criminal Procedure 29(a), "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." "A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c).

In deciding whether there is sufficient evidence to support a defendant's conviction, courts "determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt." *United States v. Pruneda-Gonzales*, 953 F.2d 190, 193 (5th Cir. 1992). The reviewing court "only ascertains whether the jury made a 'rational decision,' not 'whether the jury correctly determined guilt or innocence.'" *United States v. Zamora-Salazar*, 860 F.3d 826, 832 (5th Cir. 2017) (quoting *Lopez-Monzon*, 850 F.3d at 206). "To uphold the conviction, there is no requirement that the evidence exclude every possible 'hypothesis of innocence.'" *Id.*

---

[13] R. Doc. No. 353, at 1.

A review of the sufficiency of the evidence is "highly deferential" to the jury's verdict, and all reasonable inferences and credibility choices are to be made in support of conviction. *United States v. Isgar*, 739 F.3d 829, 835 (5th Cir. 2014); *see also United States v. Bates*, 850 F.3d 807, 810 (5th Cir. 2017). A court "must assume that the evidence offered by the prosecution is true." *United States v. Lopez-Monzon*, 850 F.3d 202, 206 (5th Cir. 2017). "If the jury was presented with sufficient evidence to support its verdict, the verdict must be upheld." *Zamora-Salazar*, 860 F.3d at 832.

Even so, the government must present evidence "allow[ing] the jury 'to find every element of the offense beyond a reasonable doubt,'" and "'must do more than pile inference upon inference' to sustain a conviction." *United States v. Vargas*, 6 F.4th 616, 622 (5th Cir. 2021) (quoting *United States v. Rojas Alvarez*, 451 F.3d 320, 333 (5th Cir. 2006), then quoting *United States v. Maseratti*, 1 F.3d 330, 337 (5th Cir. 1993)).

### b. Motion for a New Trial

Federal Rule of Criminal Procedure 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interests of justice so require." "Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2).

"Broadly speaking, Rule 33 is exercised in two situations." *United States v. Crittenden*, 46 F.4th 292, 296 (5th Cir. 2022) (citing *United States v. Hoffman*, 901 F.3d 523, 552 (5th Cir. 2018)). "One is when error infects the trial—perhaps the

4

erroneous admission or exclusion of evidence, inflammatory comments by a lawyer, or faulty jury instructions." *Id.* (citing *Hoffman*, 901 F.3d at 552–54). "A new trial request can . . . be based on procedural problems with the trial if they caused a miscarriage of justice." *Hoffman*, 901 F.3d at 552.

"The other is when the court believes the evidence weighs 'heavily against the verdict.'" *Crittenden*, 46 F.4th at 296 (citing *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997)). Unlike in the Rule 29 context, where the evidence must be viewed in the light most favorable to the verdict, a court deciding whether to grant a new trial on this second ground may "weigh the evidence and may assess the credibility of the witnesses during its consideration." *United States v. Ramos-Cardenas*, 524 F.3d 600, 605 (5th Cir. 2008); *see also Crittenden*, 46 F.4th at 296–97. "If the Court reaches the conclusion that the verdict is contrary to the weight of the evidence *and* that a miscarriage of justice may have resulted, the court may set aside the verdict and grant a new trial . . . . The power to grant a new trial on this ground should be invoked only in exceptional cases, where the evidence weighs heavily against the verdict." *Crittenden*, 46 F.4th at 297 (quotation omitted) (emphasis added).

"A new trial is granted only upon a demonstration of adverse effects on substantial rights of a defendant." *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004) (citing *United States v. Rasco*, 123 F.3d 222, 228 (5th Cir. 1997)). "[M]otions for new trial are not favored, and are granted only with great caution." *O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997).

### c. Elements of Health Care Fraud

"To prove health-care fraud in violation of 18 U.S.C. § 1347, the government must prove beyond a reasonable doubt that the defendant knowingly and willfully executed, or attempted to execute, a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health are benefit program, in connection with the delivery of or payment for health care benefits, items, or services." *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014) (cleaned up). The word "knowingly" requires the government to prove the defendant's "knowledge of the facts that constitute the offense." *United States v. Nora*, 988 F.3d 823, 830 n.2 (5th Cir. 2021) (quoting *Bryan v. United States*, 524 U.S. 184, 193 (5th Cir. 1998)). The word "knowingly" means that the act was done voluntarily and intentionally, not because of mistake or accident. Fifth Circuit Criminal Pattern Jury Instructions §§ 2.59, 1.41 (2019). "Knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact." *Id.* § 1.42 (2019).[14] The word "willfully" requires the government to prove "that the

---

[14] *See also United States v. Gibson*, 875 F.3d 179, 196 (5th Cir. 2017) ("A deliberate ignorance instruction is warranted when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference. The evidence must raise two inferences: (1) the defendant was subjectively aware of high probability of the existence of illegal conduct, and (2) the defendant purposely contrived to avoid learning of the illegal conduct.") (cleaned up); *United States v. Hesson*, 746 F. App'x 324, 336 (5th Cir. 2018) (unpublished) (noting that the Fifth Circuit has "repeated[ly] endorse[d] deliberate ignorance instructions in health care fraud . . . cases") (cleaned up); *United States v. Martinez*, 921 F.3d 452, 478 (5th Cir. 2019) (approving this instruction in dicta in a health care fraud case).

defendant acted with knowledge that his conduct was unlawful." *Nora*, 988 F.3d at 830 (quoting *Bryan*, 524 U.S. at 191–92).

### III.   ANALYSIS

#### a. Motion for Judgment of Acquittal

In his motion for judgment of acquittal, Akula argues that the government failed to establish that he acted with the requisite intent to commit health care fraud.[15] According to Akula, the evidence established that Raj Biyyam ("Biyyam")— Akula's brother-in-law—entered the Medicare billing codes for Canon "autonomously and in isolation."[16] Further, Akula asserts that the evidence showed that Biyyam's supervisor, Canon administrator Sue May ("May"), met with Biyyam and reviewed his coding, but did not report any problems to Akula, suggesting that Akula was not deliberately ignorant.[17] Akula also contends that testimony from the government's expert, Laurie McMillan ("McMillan"), established only that there were errors and omissions in Canon's billing, not that those errors and omissions were fraudulent.[18] In addition, Akula maintains that "[n]o witness testified (and no evidence established) that [Akula] had a plan to 'upcode' or that [Akula] had a plan or knowledge of deliberately unlawful billing [with respect to] each of the twenty-three convictions."[19] Akula therefore argues that "the evidence was that [Akula], if

---

[15] R. Doc. No. 352-1, at 5–6.
[16] *Id.* at 5. Biyyam did not testify at Akula's trial because he was in India.
[17] *Id.* at 5–6.
[18] *Id.* at 6.
[19] *Id.*

mistaken, was negligent[,]" and asserts that the evidence was "insufficient to support the verdict."[20]

As explained, to find that Akula had the required intent to commit health care fraud, the jury had to find that Akula acted knowingly and willfully, meaning that he acted voluntarily and intentionally, with knowledge of the facts that constitute the offense—or with deliberate ignorance of such facts—and with knowledge that his conduct was unlawful. *See Nora*, 988 F.3d at 830; Fifth Circuit Criminal Pattern Jury Instructions §§ 2.59, 1.41, 1.42 (2019). Reviewing the record, the Court finds ample evidence supporting the jury's conclusion that Akula possessed the requisite intent to commit health care fraud.

To begin, May—the administrator Akula identified as responsible for Canon's problematic billing[21]—testified that Canon's billers were related to Akula, that she seldom spoke to them, that Akula met with them privately each week, and that Akula controlled the billers.[22] May also testified that she was less tech-savvy than others

---

[20] *Id.*

[21] R. Doc. No. 358-1, 55:15–24 (AUSA: "And you're testifying that it's all Sue's fault?" Akula: "Probably.").

[22] R. Doc. No. 388-9, 257:6–258:16 (May explaining that Canon's billing department was comprised of Akula's family members); *id.* 260:8–23 (May explaining that Akula met with the billing department on Tuesdays and never asked her to participate in those meetings); R. Doc. No. 388-4, 87:10–11 (May explaining that Akula "really managed what happened in billing").

with respect to using Canon's electronic medical record software for billing.[23] Multiple other witnesses corroborated May's testimony that Akula controlled Canon's billing.[24]

Additionally, the government introduced into evidence a 2015 audit letter advising that Canon had failed 100 percent of the audited claims and stating that Canon's GIP admissions were "frequent, lengthy, and often did not include sufficient documentation to determine if they were justified."[25] The letter also stated: "Patients who are either documented as being on respite care or should be due to the circumstances are billed as GIP. The provider may be using GIP billing in order to avoid the five day limit associated with respite care."[26] Akula mentioned that he was aware of this audit letter during his trial testimony and acknowledged that the audit letter warned Canon about its GIP billing.[27] However, Akula did not discuss the results of this audit with other Canon employees, the Ochsner doctors who worked at Canon, or Demetria Ally, the quality assurance specialist hired to improve Canon's business and administrative functions.[28] Contrary to Akula's arguments, the evidence introduced through May's testimony, the 2015 audit letter, and Akula's

---

[23] R. Doc. No. 388-9, 261:14–265:23 (May explaining that she was less "savvy" with technology than other people who worked for Canon and had "limited knowledge" of codes that "had to be put in to generate billing").

[24] *See* R. Doc. No. 388, at 22 n.22 (quoting portions of the trial transcripts wherein numerous witnesses, including Dr. Oren Blalock, Ahsaki George-Scharpon, Kelly Anderson, and Demetria Ally, corroborated May's testimony).

[25] Gov. Ex. 10.020 (August 2015 audit letter), at 1–2.

[26] *Id.* at 2.

[27] R. Doc. No. 358-1 at 48:25–49:10 (transcript of discussion regarding the 2015 audit); 51:3–5 (AUSA: "[Y]ou are specifically warned in this paragraph [of the audit letter] about your GIP billing, right?" Akula: "Yes. The documentation does say that.").

[28] *Id.* at 52:2–53:20.

testimony all suggest that the jury made a "rational decision" in finding that Akula acted knowingly and willfully. *Zamora-Salazar*, 860 F.3d at 832.

Further, the jury could rationally have inferred that, as the owner of Canon, Akula knew or was deliberately ignorant of the erroneous billing. *See Willett*, 751 F.3d at 340–41 (finding that the evidence was sufficient to justify the district court's conclusion that the defendant knew about fraudulent upcoding in part because the defendant "held himself out as an owner" and "had a position of authority"). Moreover, by signing Canon's Medicare enrollment documents, Akula agreed to "abide by Medicare laws, regulations and program instructions" and to "not submit claims with deliberate ignorance or reckless disregard . . . of their truth or falsity."[29] This strongly supports the jury's finding that Akula either knew or was deliberately ignorant of the billing errors. *See Willett*, 751 F.3d at 341 (finding that the evidence was sufficient to justify the district court's conclusion that the defendant knew about fraudulent upcoding in part because the defendant signed the Medicare provider application for the company and certified that his signature bound the company to comply with the Medicare rules).

Witnesses throughout the trial also described Akula as a hands-on, involved manager who was focused on maximizing the number of patients on Canon's census.[30]

---

[29] Gov. Ex. 10.001 (Medicare enrollment certification), at 8; *see also* R. Doc. No. 358-1, 47:20–22 (AUSA: "So you have a duty to figure out what the truth is with respect to your billing, right?" Akula: "Yes.").

[30] *See, e.g.*, R. Doc. No. 388-9, 159:20–21 (Kelly Anderson describing Akula as "very micromanaging" and "controlling"); *id.* 175:2–23 (Kelly Anderson testifying that Akula refused to show her "any type of billing" and instead instructed her "to focus on your census").

And Joshua Bruce ("Bruce"), the administrator for Canon's Mississippi office, testified that, shortly after he emailed Akula asking questions about Canon's billing, Akula approached Bruce in a parking lot and told him never to include such questions in emails.[31] Again, the jury rationally could have relied on this evidence to conclude that Akula possessed the requisite intent to commit health care fraud.

Finally, the government introduced into evidence Akula's tax returns, which demonstrated that profits from Canon's New Orleans office increased by almost $500,000 the year after the August 2015 audit identified the failed claims.[32] Akula also testified that he profited more than anyone else at Canon because of the Medicare billing.[33] Evidence of a financial incentive to commit health care fraud is "circumstantial proof of knowledge." *United States v. Barnes*, 979 F.3d 283, 303, 296 (5th Cir. 2020).

As explained, a review of the sufficiency of the evidence is "highly deferential" to the jury's verdict, and all reasonable inferences and credibility choices are to be made in support of conviction. *Isgar*, 739 F.3d at 835. Applying this deferential standard to the instant case, the Court finds that the trial record contains more than enough evidence to support the jury's verdict. Accordingly, the Court will deny Akula's motion for judgment of acquittal.

---

[31] R. Doc. No. 388-5, 18:22–20:21.

[32] Gov. Ex. 73.004, at 5; *see also* R. Doc. No. 358-1, at 53–55 (transcript of Akula's testimony regarding increased profits in 2016).

[33] R. Doc. No. 358-1, 52:14–16 (AUSA: "You profit more than any other single person at Canon because of the Medicare billing, right?" Akula: "Yes.").

### b.  Motion for a New Trial

### *i. Weight and Preponderance of the Evidence*

In his motion for a new trial, Akula first argues that the Court should grant him a new trial because "the weight and preponderance of the evidence weighs heavily against the verdict."[34] Akula primarily takes issue with the testimony and report of McMillan, the government's Medicare billing and coding expert.[35] According to Akula, the patients whose records McMillan reviewed "required an unusually high level of care" such that the billing records McMillan determined were "highly unusual" were in fact "correct."[36] Akula contends that "McMillan (a nurse) simply disagreed with the level of care provided by a doctor" and that "McMillan did not argue that the treatment was unnecessary but that the patients received more care than required."[37]

The first problem with this argument is that it contravenes Akula's own trial testimony. During the trial, Akula himself admitted that "[t]here were errors" with Canon's billing and that Canon received money from Medicare that it should not have

---

[34] R. Doc. No. 353-1, at 3.

[35] *See id.* at 3–8.

[36] *Id.* at 5–7.

[37] *Id.* at 7.

received because of those errors.[38] It is impossible to reconcile those statements with the present contention that the billing was actually "correct."[39]

The second problem with this argument is that, as the government notes, McMillan was called not to evaluate the clinical decisions of the medical professionals who treated Canon's patients, but to determine whether Canon's billing was appropriate in light of the documentation submitted.[40] For example, McMillan testified that "[t]he documentation did not support the billing at the General Inpatient level of care[,]"[41] not that the patients were insufficiently sick to warrant inpatient treatment at Canon.[42] Indeed, as the government emphasized numerous times at trial, a patient's location does not necessarily determine her billing code. For instance, if a patient is in the inpatient hospice setting but does not qualify for GIP billing because she is not suffering an acute event that can only be controlled in the inpatient setting, the hospice could bill for that patient's care at the routine home care or the respite level as appropriate.

---

[38] R. Doc. No. 358-1, at 8:24–9:1 (Akula: "There were errors." AUSA: "Okay. And so because of those errors Canon should not have received federal Medicare money, correct?" Akula: "Yes."); 55:1–22 (AUSA: "Dr. Akula, you testified previously that the billing that was charged in this case, the claims that were charged in this case, should not have been submitted to Medicare, correct?" Akula: "Yes." AUSA: "And that Medicare should not have paid Canon? Canon should not have received federal Medicare money based on those claims, correct?" Akula: "Yes.").

[39] R. Doc. No. 353-1, at 5–7.

[40] R. Doc. No. 388, at 27; R. Doc. No. 358, at 25.

[41] R. Doc. No. 353-3, at 46:3–5.

[42] *See* R. Doc. No. 353-1, at 7–8 (arguing that McMillan advocated for treating patients suffering from significant medical conditions at a "'routine level of hospice care'—likely in a private home" even if those patients were homeless or without a caregiver).

In reply, Akula urges that "the fact that the patients (indisputably) had [serious medical] conditions and many could not care for themselves is important evidence that Dr. Akula was not deliberately ignorant of the errors in the billing."[43] Regardless, as discussed in the previous section, the government presented extensive evidence that Akula possessed the requisite intent to commit health care fraud, including evidence that Akula controlled the billing and did not change Canon's practices after he was notified that Canon failed the 2015 audit, evidence that Akula was focused on maximizing Canon's profits, evidence that Akula directed employees not to include questions about billing in emails, and, through his tax returns, evidence that Akula had a financial incentive to commit health care fraud.[44]

Accordingly, weighing the evidence and assessing the credibility of the witnesses, including the defendant, the Court is unable to conclude that "the verdict is contrary to the weight of the evidence and that a miscarriage of justice may have resulted." *Crittenden*, 46 F.4th at 297 (quotation omitted). On the contrary, the jury made a reasonable decision based on the evidence presented. In light of the Fifth Circuit's admonition that "motions for new trial are not favored, and are granted only with great caution[,]" the Court will deny Akula's motion for a new trial on this ground. *O'Keefe*, 128 F.3d at 898.

---

[43] R. Doc. No. 363, at 7.

[44] *See supra* Section III.a.

14

*ii. Admission of the Government's Expert's Report*

Next, Akula argues that he received ineffective assistance of counsel when his trial counsel consented to admit government expert McMillan's report into evidence.[45] The government concedes that it mistakenly requested that McMillan's expert report, which contained hearsay, be admitted into evidence.[46] Accordingly, the Court considers only whether trial counsel's consent to admit this report satisfies the demanding standard for an ineffective assistance of counsel claim.

"A defendant may raise a claim of ineffective assistance of counsel in a motion for a new trial." *United States v. Bishop*, 629 F.3d 462, 469 (5th Cir. 2010). "However, a motion for relief in habeas corpus pursuant to 28 U.S.C. § 2255 'is the preferred method for raising a claim of ineffective assistance of counsel.'" *Id.* (quoting *United States v. Gordon*, 346 F.3d 135, 136 (5th Cir. 2003)). "Regardless of whether an ineffective assistance of counsel claim is raised in a motion for a new trial, on collateral review, or on direct appeal, the standard of review is the same." *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 697 (1984)). "The defendant bears the burden of demonstrating that (1) counsel's performance fell below an objective standard of reasonableness and that (2) but for counsel's deficient performance, the result of the

---

[45] R. Doc. No. 353-1, at 8–11.

[46] R. Doc. No. 388, at 31; R. Doc. No. 358, at 28. Notwithstanding the government's concession, the Court notes that hearsay evidence may be admitted with the consent of the parties. *Cf. United States v. Pearson*, 508 F.2d 595, 596 (5th Cir. 1975) ("Where there is no objection to hearsay the jury may consider it for whatever value it may have."). There may be strategic reasons why a party may not object to such evidence. For example, a party may take the position that the oral testimony of an expert with respect to a certain point may be more damaging than a written report.

15

proceeding would have been different." *Id.* (citing *Strickland*, 466 U.S. at 687–96). "If the Court finds that [the defendant] has made an insufficient showing as to either prong, it may dispose of the claim without addressing the other prong." *United States v. Henry*, No. 08-19, 2010 WL 2998888, at *3 (E.D. La. July 28, 2010) (Vance, J.) (citing *Strickland*, 466 U.S. at 697).

The Court begins its analysis by considering whether the admission of the expert report prejudiced Akula pursuant to *Strickland*'s second prong. *See Strickland*, 466 U.S. at 697 (explaining that courts may address either *Strickland* prong first). To demonstrate prejudice, Akula "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Akula argues that the admission of the report prejudiced him because the report contained "hearsay and other inadmissible evidence[,]" was confusing insofar as "it was critical of conduct that was uncharged[,]" and included "conclusory" statements about the inadequacy of the documentation without providing the context of the patients' entire medical records.[47] Akula also stresses that the jury returned its verdict ten minutes after the Court answered a question from the jury asking where to find the report in the exhibits.[48]

---

[47] R. Doc. No. 353-1, at 9–10. In reply, Akula also suggests that the report included "inflammatory information[,]" though Akula does not specify which information in the report he believes is inflammatory, nor does he offer any reason why such information might be inflammatory. *See* R. Doc. No. 363, at 7–8.
[48] R. Doc. No. 353-1, at 10.

16

Upon review, the Court finds that Akula has not satisfied *Strickland*'s prejudice prong. Most significantly, had Akula's counsel not consented to the admission of McMillan's report, McMillan would have testified regarding the same conclusions stated in her report—namely, that Canon's billing lacked sufficient supporting documentation.[49] Indeed, before the report was admitted, McMillan testified to many of its conclusions. For example, she testified that Canon was "billing CPT codes, which is highly unusual, . . . that those CPT codes were being billed day after day after day when they initially came on service[,]" and that the documentation did not support the billing of those CPT codes.[50] Akula does not explain how hearing such evidence through testimony instead of through the report would have made any difference to the jury.

Additionally, as noted, Akula himself testified that there were errors with Canon's billing and that Canon received money from Medicare that it should not have received because of those errors.[51] Further, testimony from the doctors actually providing care for the patients coincided with the conclusions contained in McMillan's report. For example, while on the witness stand, Dr. Oren Blalock reviewed his Subjective, Objective, Assessment and Plan ("SOAP") notes for patient JoMo, which showed that this patient was not suffering from any acute events at the time that

---

[49] *See* R. Doc. No. 388, at 34 (explaining that "McMillan was prepared to continue reviewing her findings, including as to hospice eligibility, GIP, and billing under CPT codes for the patients identified in the indictment"); R. Doc. No. 358, at 32 (same).
[50] R. Doc. No. 353-3, at 30:23–31:3.
[51] R. Doc. No. 358-1, at 8:24–9:1; 55:1–22.

Canon billed his care to the GIP level of care.[52] Since the purpose of McMillan's testimony was to establish that there were problems with Canon's billing, Akula's own acknowledgement of Canon's problematic billing and the doctors' testimony contrasting the patients' treatment and statuses with the billing substantially diminished the importance of McMillan's report.

Based on the extensive admissible evidence of Canon's problematic billing practices that corroborated the conclusions in McMillan's report, the Court simply cannot find that there is a "reasonable probability" that, but for counsel's consent to the admission of McMillan's report, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. In reaching this conclusion, the Court is mindful that a motion pursuant to 28 U.S.C. § 2255 is the preferred method for raising a claim of ineffective assistance of counsel. *See Bishop*, 629 F.3d at 469. Because the Court finds that the admission of McMillan's report did not amount to *Strickland* prejudice, it need not consider whether consenting to the admission of this report satisfied *Strickland*'s deficiency prong. *See Henry*, 2010 WL 2998888, at *3; *Strickland*, 466 U.S. at 697. Akula's motion for a new trial on this basis will therefore be denied.

### iii.  Limitation of Akula's Expert's Testimony

Akula's final argument is that he should be granted a new trial because this Court erred in limiting the testimony of the defense's expert witness, Dr. Gregg Davis

---

[52] *See generally* R. Doc. No. 388-8, at 21:11–82:5. The Court notes that, both in the indictment and at trial, patients were referred to by the first two letters of their first and last names to protect their privacy.

("Davis").[53] A new trial may be appropriate where "error infects the trial[,]" such as where the Court erroneously excluded evidence and the exclusion "caused a miscarriage of justice." *Crittenden*, 46 4th at 292; *Hoffman*, 901 F.3d at 552. Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"To qualify as an expert, the witness must have such knowledge or experience in his field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (cleaned up). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)). "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue." *Id.* The objective of

---

[53] R. Doc. No. 353-1, at 11.

the Court's gatekeeping role pursuant to Rule 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) "is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). District courts have "wide latitude" in deciding whether to admit expert testimony. *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 615 (5th Cir. 2018).

During the trial, Akula's counsel called Davis as a witness and questioned him about his education and his medical practice.[54] Davis testified that he went to medical school at the University of Illinois, completed his residency at the University of Illinois, and became board certified in family medicine.[55] He also discussed his experience with Medicare patients and hospice patients.[56] Davis further explained that, while he was in solo practice from 2000–2018, he billed Medicare, "did all of [his] own coding[,]" including for hospice patients, and "ran both the clinical and the administrative component of [his] practice."[57]

At this point, Akula's counsel moved to declare Davis as an "expert in the area of Medicare billing, coding, and practice . . ."[58] The government objected to Davis being qualified as an expert in Medicare coding and billing on the ground that the

---

[54] R. Doc. No. 353-4 (transcript of Davis's testimony), at 3:19–8:19.
[55] *Id.* at 4:25–5:7.
[56] *See generally id.* at 4:3–8:19.
[57] *Id.* at 6:9–14; 8:16–19.
[58] *Id.* at 8:20–22.

Court had not heard evidence that Davis had expertise in those areas.[59] The Court agreed with the government and denied the request to qualify Davis as an expert in Medicare billing and coding "at this stage."[60]

Upon further questioning from Akula's counsel, Davis reiterated that "[s]tarting in . . . 2000 [he] did all of the coding for [his] practice, which included inpatient, outpatient, hospice, nursing home."[61] He also testified that, around 2000 or 2001, he took a face-to-face class training him in coding, which was followed by a "remote or self-study class[.]"[62] He explained that this class lasted around twelve to sixteen hours, and that only about "*[a]n hour or two*" of that class related to hospice billing.[63] Davis further testified that "[t]his is the class that certified coders and billers take before they become certified[,]" that he "took and passed the examination on the first try[,]" but "simply never actually requested the certificate itself[.]"[64] In addition, Davis stated that he has previously lectured about a "component of coding that deals with severity and intensity of illness in patients" related to determining "the correct code to identify the diagnosis of the patient" and determining "the appropriate code . . . to describe the services that were provided, history, physical examination, medical complexity[.]"[65]

---

[59] *Id.* at 8:24–9:2.
[60] *Id.* at 9:13–18.
[61] *Id.* at 10:4–6.
[62] *Id.* at 10:18–20.
[63] *Id.* at 14:8–24 (emphasis added).
[64] *Id.* at 10:18–24.
[65] *Id.* at 12:14–15:9.

However, Davis also testified that he had never been qualified as an expert in coding or in Medicare and had never written any articles on coding or Medicare.[66] Further, he testified that he was not board-certified in hospice care[67] and revealed that his hospice-related Medicare billing and coding training was limited.[68] On cross-examination, Davis appeared to struggle with the applicable CPT codes and to have only a loose understanding of the hospice levels of care.[69] After cross-examination, the government noted its objection to any expert opinion by Davis "in relation to Medicare, Medicare regulations, hospice regulations, [and] hospice billing."[70]

Ultimately, because Davis was not a certified professional coder, had never been qualified as an expert in coding or Medicare, had never published any articles on the topic, and did not demonstrate command of these topics during his testimony, the Court agreed with the government and denied Akula's counsel's request to qualify Davis as an expert in Medicare billing and coding.[71] However, based on his clinical experience and pursuant to an agreement between the parties, the Court nevertheless qualified Davis as having "expertise in clinical decision-making regarding hospice eligibility, but not how someone should be billed . . . to Medicare."[72]

---

[66] *Id.* at 12:11–13.
[67] *Id.* at 16:25–17:2.
[68] *See id.* at 14:8–24; 16:15–24.
[69] *See id.* at 14:25–14.
[70] *Id.* at 17:3–6.
[71] *See* 17:11–18:2; 18:18–19:5.
[72] *Id.* at 24:17–21.

Akula now argues that the Court's decision to exclude Davis's testimony with respect to Medicare billing and coding was based on a misunderstanding.[73] According to Akula, the Court denied Akula's motion because Davis simply "never requested the certificate to hang on his wall" even though he had taken the required class and passed the required exam to become a certified coder and biller.[74] However, as described above, the Court's decision to limit Davis's expert testimony was based on a variety of problems with his testimony in addition to the fact that he was not a certified professional coder. Moreover, the Court notes that Akula's motion argues Davis would have testified that Canon's "treatment and coding were correct (or largely correct)."[75] As explained, however, in his own testimony at trial—which preceded Davis's testimony—Akula acknowledged that Canon's coding was *not* correct.[76]

Accordingly, the Court is not persuaded that its decision to exclude certain testimony from Davis while permitting him to testify as an expert in clinical decision-making regarding hospice eligibility constituted an "error" that "infect[ed] the trial." *Crittenden*, 46 F.4th at 296. Even assuming there was any error, there is no indication that the exclusion of Davis's testimony "caused a miscarriage of justice" given Akula's testimony that there were errors in Canon's Medicare billing and coding. *Hoffman*, 901 F.3d at 552. Akula's motion for a new trial on this basis will be denied.

---

[73] R. Doc. No. 353-1, at 12–13.
[74] *Id.* at 13.
[75] *Id.* at 14.
[76] R. Doc. No. 358-1, at 8:24–9:1; 55:1–22.

### c.  Oral Argument

Finally, the Court considers Akula's request for oral argument with respect to his motion for a new trial.[77] The Court previously deferred its decision regarding whether to conduct oral argument or an evidentiary hearing.[78] Having considered the parties' briefing and exhibits at length, the Court now finds that oral argument and an evidentiary hearing are unnecessary. *See Bishop*, 629 F.3d at 469–70 (affirming district court's decision not to hold an evidentiary hearing where the defendant requested such a hearing in connection with her motion for a new trial based on ineffective assistance of counsel).

## IV.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Akula's motion for judgment of acquittal is **DENIED**.

**IT IS FURTHER ORDERED** that Akula's motion for a new trial is **DENIED**. Akula's request for oral argument in connection with this motion is also **DENIED**.

New Orleans, Louisiana, January 31, 2024.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[77] R. Doc. No. 353, at 1–2.
[78] R. Doc. No. 361.

24